IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

QUINTON JACKSON,

Defendant.

CRIMINAL CASE NO.

1:15-CR-00159-SCJ-JFK

## REPORT AND RECOMMENDATION

Pending before the court is Defendant Quinton Jackson's motion [Doc. 15] to suppress statements and motion [Doc. 16] to suppress evidence obtained on August 22, 2014, resulting from a warrantless traffic stop and arrest.  An evidentiary hearing was held on October 20, 2015, on Defendant's motions to suppress.[1]  [Doc. 23].  In his post-hearing brief in support of the motions to suppress, Defendant contends that he was unlawfully seized and arrested without probable cause resulting in the unlawful warrantless search of his vehicle.  [Doc. 26 at 9-16].  In making these arguments, Defendant challenges the credibility of the officers who conducted the traffic stop. [Id.].  Defendant also asserts that he was initially questioned, after his custodial arrest,

---

[1]Citations to the transcript of the hearing are:  (Tr. at ).

without being advised of his Miranda[2] rights and that his subsequent statements, made after being informed of and waiving Miranda rights, should be suppressed as fruits of the initial unlawfully obtained statements.  [Id. at 16-19].

In response, the Government contends that the initial traffic stop was lawful, that the officers had probable cause for Defendant's arrest and that the vehicle was searched lawfully pursuant to the automobile exception to the warrant requirement. [Doc. 28].  The Government does not rely on any other basis for the search of the vehicle.  [Id.].  The Government contends that, although Defendant's statements made before Miranda warnings will not be offered in the case in chief at trial [Id. at 11 n.3], those statements may be considered in the probable cause determination for the search of the vehicle [Id. at 9, 11-12].  And the Government contends that Defendant's voluntary, post-Miranda statements are not subject to suppression as fruits of Defendant's voluntary pre-Miranda statements.  [Id. at 11-12].

In reply to the Government's argument that the automobile exception applies in this case, Defendant contends that the officers lacked probable cause to search his vehicle.  [Doc. 29 at 5].  Although Defendant acknowledges that non-Miranda voluntary statements can be considered to establish probable cause for a search, he

---

[2]See Miranda v. Arizona, 86 S. Ct. 1602, 1630 (1966).

argues that his statements were not voluntary. [Id. at 6-8]. And, apparently abandoning his first argument that the non-Miranda statements tainted his subsequent statements, Defendant contends that the unlawful arrest and warrantless search of his vehicle taint his post-Miranda statements requiring suppression. [Id. at 9].

After consideration of the arguments, record before the court and relevant legal authorities, the court finds that Defendant's motions are due to be denied.

## I.     Background Facts

On August 22, 2014, City of Atlanta ("APD") Police Officers Kevin Romer, Caleb Munson,[3] and Daryl Moore[4] were assigned to the Crime Suppression Unit ("CSU")[5] in Zone 6 which covers the Boulevard-Parkway-Edgewood area of Atlanta.

---

[3]Officers Romer and Munson have been with the APD for four years. (Tr. at 3-4, 40-41). The officers have worked together during most of their careers with APD. (Tr. at 4-5, 41-42).

[4]Officer Moore has been with the APD for three years. (Tr. at 84-85). Officer Moore has worked with Officers Romer and Munson for approximately six months. (Tr. at 5, 42, 85).

[5]The CSU is a proactive policing unit in which officers patrol Zone 6 trying to prevent criminal activity instead of responding to 911 calls. (Tr. at 4, 21, 41). This area is considered a high crime, densely populated area in which the officers experience a lot of drug activity and violent crimes, including shootings and fights. (Tr. at 5-8, 42-46). The officers work evening hours and have conducted hundreds of traffic stops as part of their duties, recovering drugs and firearms from vehicles. (Tr. at 5-8, 42-46, 65).

AO 72A
(Rev.8/82)

(Tr. at 4, 41, 85).  On that date, between 9:00 and 9:30 p.m., the officers, in uniform with weapons and in a marked patrol vehicle,[6] observed Defendant Jackson, who was driving a silver Chevy Impala sedan, on Boulevard as he turned onto Angier.  (Tr. at 8-9, 11, 23-24, 46-49, 98).   As Defendant was driving westbound on Angier, the officers followed him observing that the tag lights were not working on his vehicle and, therefore, were not illuminating the vehicle's license plate.  (Tr. at 8-9, 23-24, 47-48, 67-69).  At the intersection of Angier and Parkway, the officers activated the patrol vehicle's blue lights, and Defendant stopped shortly after turning onto Parkway.  The patrol vehicle stopped eight to ten feet behind Defendant's vehicle.  (Tr. at 9-10, 25-26, 48-49, 86).  Due to the time of night and poor street lighting, the area was fairly dark except for the patrol vehicle's headlights.[7]  (Tr. at 10-11, 49-50).

The three officers exited the patrol vehicle, with Officer Munson approaching Defendant's vehicle on the driver's side and Officers Romer and Moore approaching on the passenger side.  (Tr. at 11-12, 27-28, 50-51, 86).  As the officers reached the

_____

[6]Officer Munson was driving; Officer Romer was seated in the front passenger seat; and Officer Moore was sitting behind Romer.  (Tr. at 9, 47).

[7]Although the patrol vehicle also had a spotlight, no officer testified that it was used.  (Tr. at 11, 50).  Officers Munson and Moore recalled that they used their flashlights during the encounter, and Officer Romer did not recall whether he did or not use his flashlight.  (Tr. at 11, 50, 86, 94).

4

trunk area of Defendant's vehicle, Officer Moore advised that he observed Defendant leaning forward, using his right arm, as if reaching under the seat, which caused the officers to be concerned that Defendant may be placing something under or retrieving something, such as a firearm, from under the seat.[8] (Tr. at 13, 29-30, 51, 70-71, 86-87, 94). Officers Romer and Moore reached the passenger side window first which Defendant partially rolled down, and Officer Romer instructed Defendant to roll down the driver's side window and converse with Officer Munson; instead, Defendant asked Officer Romer why they stopped him.[9] (Tr. at 12-13, 27-28, 30-31, 51-52, 87, 95-98). Defendant ignored repeated instructions to roll down the driver's side window. (Tr. at 12-14). During this time, Officer Romer noticed the odor of raw marijuana.[10] (Tr. at 12, 31). He did not see any drugs or a firearm in the vehicle. (Tr. at 31-32).

---

[8]Neither Officer Romer nor Officer Munson noticed any movements at this time. (Tr. at 30, 71).

[9]Officer Romer also could not see Defendant's left hand. (Tr. at 13, 39). Officer Moore testified that when he reached the passenger window, because he could not see Defendant's hands, he instructed Defendant to show his hands. Defendant complied. (Tr. at 95-98).

[10]The officer testified that as part of his training at the police academy, on one occasion at the crime lab, he was introduced to the smell of raw marijuana, which has a distinctive odor, and that during his work as an officer he has had experience, fifty to one-hundred times, handling and smelling marijuana. The officer said that he is familiar with the smell of raw marijuana. (Tr. at 6-7, 18-20, 37-38).

AO 72A
(Rev.8/82)

When Officer Munson reached the driver's door, the window was rolled down three to four inches, but Defendant refused to fully roll down the window despite repeated instructions to do so. (Tr. at 12-14, 51-52, 87). Officer Munson testified that, based on his prior experience conducting traffic stops, Defendant's conduct, including, shaking, heavy breathing, moving around a lot, not obeying commands, looking back and forth between the officers and appearing to try to decide what to do next, depicted "fight or flee." (Tr. at 52-53, 75-76, 83). The Officer observed Defendant start to reach down to the driver's side floorboard, and, being concerned Defendant was attempting to destroy evidence or grab "something to use on the officers," the officer opened the driver's door and pulled Defendant out of the vehicle. (Tr. at 12-14, 52-53, 62-63, 87). During this time, Officer Moore walked around to the driver's side to assist Officer Munson with securing and handcuffing Defendant. (Tr. at 14, 32-33, 53-54, 87, 99). Both officers smelled the odor of raw marijuana emanating from the open vehicle doorway.[11] (Tr. at 75-76, 87).

---

[11]Officer Munson testified that, although he did not recall being exposed to marijuana during his police academy training, he has participated in more than one-hundred cases that involved both raw and burnt marijuana and that he is familiar with the smell of raw marijuana. (Tr. at 44-45).

6

As Defendant was being handcuffed, Officer Moore asked Defendant if there was anything illegal in the vehicle.  Defendant responded that there was a firearm.  (Tr. at 54, 87).  As Defendant was relocated by Officer Moore to the area in front of the patrol vehicle, Officer Munson leaned down and looked into Defendant's vehicle observing the butt of a firearm under the driver's seat which he retrieved.  (Tr. at 17, 54-55, 76-78).  And as Officer Moore walked with Defendant, holding onto one of Defendant's arms, back to the patrol vehicle, the officer asked Defendant if there was anything else illegal in the vehicle.[12]  Defendant responded that there "may be something inside of a Gucci bag" located in the center console.[13]  (Tr. at 87).  While Defendant was standing in front of the patrol vehicle, Officer Romer asked for and obtained Defendant's name and date of birth in order to run a criminal history check.[14]

---

[12]Officer Moore asked these questions due to Defendant's movements while in the vehicle and because of detecting the odor of marijuana from the vehicle.  (Tr. at 104-05).

[13]Officer Munson recalled being advised that there were drugs in a Gucci bag. The officers did not recall who retrieved the Gucci bag which contained heroin, crack cocaine and methamphetamine.  No marijuana was found in the areas of the vehicle that were searched.  (Tr. at 16-17, 55-56, 78-79, 87-88).

[14]Defendant also made another statement to Officer Moore, which the Government does not intend to introduce in the case in chief at trial.  The officer said something like, "Man you were really reaching for that gun," to which Defendant responded, "Yes I did not want to go back to jail."  (Tr. at 89).

7

(Tr. at 15, 33-35).  From the time that the officers advised by radio that they were conducting a traffic stop, to the time that the firearm was seized from the vehicle, approximately two minutes elapsed; and from the time of the stop being initiated to the time the drugs were seized and a tow truck called for Defendant's vehicle, another two minutes elapsed.  (Tr. at 16, 35, 58-61, 79; Gov't Exh. 1).

Although not clear, at some point after Defendant was removed from the vehicle, handcuffed and walked to the front of the patrol vehicle, another CSU Officer, Henderson, arrived on scene.  (Tr. at 15, 63, 92-93, 100-01).  Officer Henderson recognized Defendant from an incident a few weeks before when the officer tried to detain Defendant.  Defendant fled in his vehicle, dragging the officer for a period of time.  Officer Henderson advised that there should be an active obstruction warrant for Defendant.  Officer Romer confirmed the existence of the warrant and that the firearm seized from the vehicle was stolen.  (Tr. at 16-17, 63, 101).

Defendant was placed in Officer Henderson's patrol vehicle for transportation because the other patrol vehicle did not have a security partition between the front and back seats. (Tr. at 16-17).  Officer Moore entered the vehicle and advised Defendant orally of his <u>Miranda</u> rights using a warning card.  (Tr. at 89-90; Gov't Exh. 2).  The officer advised Defendant:

8

1.      You have a right to remain silent.
2.      Anything you say will be used in court as evidence against you.
3.      You are entitled to have a lawyer now and have him present now or at anytime during questioning.
4.      If you cannot afford a lawyer, one will be appointed for you without cost and he may be present at all times during your questioning.
5.      You can decide at any time to exercise these rights and not answer any questions or make any statements.

(Gov't Exh. 2).  The waiver of rights is on the reverse side of the card and reads as follows:

1.      Do you understand these rights?
2.      Do you wish to talk to us at this time without a lawyer?

(Tr. at 102; Gov't Exh. 2).  Defendant agreed to speak with the officer and made statements.[15]  (Tr. at 90).  During both the pre-<u>Miranda</u> and <u>Miranda</u> statements, Defendant did not appear to be under the influence of drugs or alcohol, and no threats or promises were made by the officers.  (Tr. at 91-93).  The officers only raised their voices when Defendant failed to comply with instructions while he was seated in the vehicle; otherwise, the conversation was friendly and Defendant was calm.  (Tr. at 18, 56-57, 91).  The officers only touched Defendant to remove him from the vehicle, to handcuff him and to escort him to the area in front of the patrol vehicle.  (Tr. at 14, 53-

_____

[15]Defendant did not sign a waiver of rights form.  (Tr. at 102).

9

54, 87, 92, 99).   Their weapons remained holstered during the traffic stop and questioning.  (Tr. at 91).

Additional facts will be set forth as necessary in discussion of the motions to suppress.

## II.   Discussion

Defendant seeks to suppress evidence seized as a result of a warrantless search of the vehicle he was operating on August 22, 2014.  Defendant was also placed under arrest that evening and made statements before and after he was given Miranda warnings which he seeks to suppress.  [Doc. 26].  As to the search of the vehicle, Defendant contends that the APD officers lacked probable cause for the search and for his arrest on firearm and drug charges.  [Id.; Doc. 29].  With respect to the statements he made that day, Defendant contends that the statements made prior to Miranda warnings, which the Government does not intend to introduce in the case-in-chief at trial but are offered to support probable cause, were not voluntary and that the post-Miranda statements are tainted by the unlawful arrest and search and are not admissible at trial.  [Id.].  The Government responds that the totality of the circumstances known to the officers established probable cause for Defendant's arrest and for the search of the vehicle.   [Doc. 28].   The Government further argues that the pre-Miranda

10

statements were voluntary and that, because Defendant was lawfully arrested and the vehicle lawfully searched, Defendant's post-<u>Miranda</u> statements are admissible. [<u>Id.</u>]. Because Defendant relies in part on arguments that the testimony of the APD officers is not credible and should not be considered by the court, the court will first address the law governing credibility determinations.

     **a.**    **Credibility**

     Defendant contends that the credibility of Officers Romer, Munson and Moore is undermined by the inconsistencies in their respective testimony, for example, the failure of all of the officers to observe various events at the same time, and by the lack of support for other observations, for example, the detection of the odor of raw marijuana. For these reasons, as discussed in more detail *infra*, Defendant argues that the court should disregard various aspects of the officers' testimony, particularly, Defendant's alleged furtive movements and conduct during the traffic stop and the odor of marijuana. [Docs. 26 and 28]. "Credibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses." <u>United States v. Ramirez-Chilel</u>, 289 F.3d 744, 749 (11th Cir. 2002). In weighing the credibility of a witness, the court takes "into account the interests of the

witnesses, the consistencies or inconsistencies in their testimonies, and their demeanor on the stand." Id. at 750; see also United States v. Wein, 2006 WL 2128155, at *3 (W.D. Pa. July 27, 2006) (noting that "customary techniques to ascertain the credibility of the witnesses" included, but was "not limited to: appearance and conduct of each witness, the manner in which he testified, the character of the testimony given, his intelligence, motive, state of mind, and demeanor while on the stand"). And, unless the evidence "'is contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable factfinder could accept it" or unless the factfinder's determinations appear to be "'unbelievable[,]'" a reviewing court should accept those findings of fact. Ramirez-Chilel, 289 F.3d at 749 (citations omitted); accord United States v. Griffith, 397 Fed. Appx. 613, 617-18 (11th Cir. 2010).

The court has evaluated the testimony of each officer based on these guidelines and, for the reasons stated *infra*, finds the officers' testimony credible.

### b.   Traffic Stop, Arrest, Search and Pre-Miranda Statements

"A traffic stop, which 'is a seizure within the meaning of the Fourth Amendment,' . . . 'is constitutional if it is either based upon probable cause to believe a traffic violation has occurred or justified by reasonable suspicion in accordance with Terry[v. Ohio, 88 S. Ct. 1868 (1968)].'" United States v. Spoerke, 568 F.3d 1236,

1248 (11ᵗʰ Cir. 2009) (citations omitted).  As the Eleventh Circuit Court of Appeals stated in United States v. Cooper, 133 F.3d 1394 (11ᵗʰ Cir. 1998), "law enforcement 'may stop a vehicle when there is probable cause to believe that the driver is violating any one of the multitude of applicable traffic and equipment regulations relating to the operation of motor vehicles.'"  Id. at 1398 (quoting United States v. Strickland, 902 F.2d 937, 940 (11ᵗʰ Cir. 1990)); see also United States v. Terry, 220 Fed. Appx. 961, 963 (11ᵗʰ Cir. 2007) (same).  And "[w]hen determining whether an officer had probable cause to believe that a traffic violation occurred, the 'officer's motive in making the traffic stop does not invalidate what is otherwise objectively justifiable behavior under the Fourth Amendment.'"[16]  United States v. Harris, 526 F.3d 1334, 1337 (11ᵗʰ Cir. 2008) (citation omitted); see also United States v. Artiles-Martin, 2008 WL 2600787,

---

[16]The law is well established that "'[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.'"  United States v. Jones, 377 F.3d 1313, 1314 (11ᵗʰ Cir. 2004) (quoting Whren v. United States, 116 S. Ct. 1769, 1774 (1996)); see also United States v. McGough, 412 F.3d 1232, 1239 (11ᵗʰ Cir. 2005) (indicating that the magistrate judge had improperly discussed the officers' motives for entering the apartment in resolving the case, the appellate court noted that the test "is an objective one"); United States v. Hernandez, 418 F.3d 1206, 1209 n.4 (11ᵗʰ Cir. 2005) ("[a]n officer's 'subjective intentions' are not relevant for Fourth Amendment analysis").  Although not explicitly argued by Defendant, to the extent his contentions about how the traffic stop was conducted might be read to argue pretext, those arguments are rejected.

at *5 (M.D. Fla. June 30, 2008) (the defendant's contention that traffic stop was pretext to conduct search of tractor-trailer foreclosed by Whren).

The APD officers had probable cause to stop Defendant's vehicle on the basis of their observation of a violation of Georgia traffic law, that is, inoperable tag lights. See O.C.G.A. § 40-8-23(d) ("Either a taillight or a separate light shall be so constructed and placed as to illuminate with a white light the rear registration plate and render it clearly legible from a distance of 50 feet to the rear."). On August 22, 2014, between 9:00 and 9:30 p.m., Officers Romer, Munson and Moore observed Defendant Jackson driving a silver Chevy Impala sedan on Boulevard as he turned onto Angier. (Tr. at 8-9, 11, 23-24, 46-49, 98). As Defendant was driving westbound on Angier, the officers followed him observing that the tag lights were not working on his vehicle and, therefore, were not illuminating the vehicle's license plate. (Tr. at 8-9, 23-24, 47-48, 67-69). At the intersection of Angier and Parkway, the officers activated the patrol vehicle's blue lights, and Defendant stopped shortly after turning onto Parkway. The patrol vehicle stopped eight to ten feet behind Defendant's vehicle. (Tr. at 9-10, 25-26, 48-49, 86). These observations established a violation of O.C.G.A. § 40-8-23(d). See Carnes v. State, 293 Ga. App. 549, 550, 667 S.E.2d 620, 621 (2008) ("'There was probable cause for the initial stop, based on the officer's observance of a traffic

14

violation, the nonfunctioning tag light.'") (citations omitted); and see United States v. Cubillos, 2012 WL 1636175, at *3 (N.D. Ga. March 20, 2012), adopted by 1:10-CR-86-RWS, Doc. 721 (N.D. Ga. May 8, 2012) (based on the officer's testimony that there was no tag light on the vehicle as required by law, he "had probable cause upon which to stop the [vehicle] for this perceived violation of Georgia law"). The traffic stop was lawfully initiated.

The legality of traffic stops is analyzed under the test set forth in Terry. "[A] traffic stop 'must last no longer than is necessary to effectuate the purpose of the stop.'" United States v. Ramirez, 476 F.3d 1231, 1237 (11th Cir. 2007) (quoting United States v. Pruitt, 174 F.3d 1215, 1220 (11th Cir. 1999)); and see Rodriguez v. United States, 135 S. Ct. 1609, 1614 (2015) ("the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission' - to address the traffic violation that warranted the stop . . . and to attend to related safety concerns"). Absent articulable suspicion of other criminal activity, a traffic stop may last no longer than necessary to process the traffic violation. United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001). However, the duration of a traffic stop may be prolonged to investigate, by the use of computer checks, the driver's license and the vehicle registration and, for officer's safety, the criminal history of the driver. United States

15

v. Boyce, 351 F.3d 1102, 1106 (11th Cir. 2003)[17]; Purcell, 236 F.3d at 1277-78. Additionally, "[d]uring a lawful traffic stop, officers . . . may take steps that are reasonably necessary to protect their personal safety . . . , including requiring the driver and passengers to exit the vehicle 'as a matter of course.'" Spoerke, 568 F.3d at 1248 (quoting Maryland v. Wilson, 117 S. Ct. 882, 884 (1997); Pennsylvania v. Mimms, 98 S. Ct. 330, 333-34 (1977)). "Moreover, in connection with a traffic stop, an officer may conduct a pat down search if he has reason to believe that his own safety or the safety of others is at risk." United States v. Smith, 481 Fed. Appx. 540, 543 (11th Cir. 2012).

Defendant argues that, after stopping Defendant's vehicle for the inoperable tag light, the officers did not conduct a properly limited traffic stop as evidenced by their failure to advise Defendant of the reason for the stop and by their failure to request Defendant's drivers license, vehicle registration and insurance. [Doc. 26 at 9-10]. The court, however, as explained by the officers and based on the conclusions they drew,

---

[17]However, each of these computer checks must be conducted as a routine part of the traffic stop and not undertaken after the conclusion of the traffic stop to further detain a driver absent articulable suspicion of other criminal activity. Boyce, 351 F.3d at 1107 (finding that the criminal history check in that case was not requested until several minutes after the traffic stop had concluded and after the officer had asked for and been refused consent to search the vehicle).

relying on their training and experience, from their observations, finds that the events that occurred following the officers exit from the patrol vehicle rapidly provided grounds for Defendant's arrest and search of the vehicle, setting the normal traffic stop routine to the sidelines.  See Terry, 88 S. Ct. 1868 (law enforcement officers may also briefly detain individuals for purposes of investigating a crime if they have a reasonable, articulable suspicion based on objective facts that the individual has engaged in, or is about to engage in, criminal activity); Harris, 526 F.3d at 1337 (same); United States v. Lindsey, 482 F.3d 1285, 1290 (11th Cir. 2007) (same).  In fact, in this case, the court finds that the officers had not only a reasonable suspicion that Defendant had engaged or was engaging in criminal activity but probable cause.

In Craig v. Singletary, 127 F.3d 1030 (11th Cir. 1997), the Eleventh Circuit Court of Appeals stated:

> Probable cause to arrest exists when the facts and circumstances within the collective knowledge of law enforcement officers, or of which they have reasonably trustworthy information, would cause a prudent person to believe that the suspect has committed or is committing an offense. . . . Because "sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment" . . . "probable cause itself is a doctrine of reasonable probability and not certainty[.]"

Id. at 1042 (citations omitted); see also Lindsey, 482 F.3d at 1291 ("Probable cause to arrest exists when the totality of the facts and circumstances support 'a reasonable

17

belief that the suspect had committed or was committing a crime.'") (citation omitted).

Thus, "[s]ince a finding of probable cause requires only a probability of criminal activity . . . a court assessing probable cause in hindsight must assess both the totality of the circumstances and the inferences that flow from those circumstances." United States v. Wai-Keung, 845 F. Supp. 1548, 1557 (S.D. Fla. 1994), aff'd, 115 F.3d 874 (11th Cir. 1997) (citations omitted).  A law enforcement officer need not resolve all inferences and factual conflicts in favor of the suspect.  "An officer's decision to arrest a suspect may be objectively reasonable even though that officer has not specifically discarded every possible non-criminal explanation for the conduct that forms the basis for [the] decision to arrest a suspect." Bailey v. Bd. of Cnty. Comm'rs of Alachua Cnty., Fla., 956 F.2d 1112, 1119 n.5 (11th Cir. 1992).  "In reviewing probable cause determinations, [a court] must consider the totality of the circumstances-including the officers' training and experience as well as their knowledge of the situation at hand."[18] United States v. Buchanan, 70 F.3d 818, 826 (5th Cir. 1996).  "[A] police officer may draw inferences based on his own training and experience in deciding whether

---

[18]Officers Romer's, Munson's and Moore's police academy training and experience over three to four years conducting traffic stops and encountering suspects on hundreds of occasions, including seizing firearms and drugs from vehicles, provides grounds for crediting their opinions based on the events they observed during the traffic stop in this case.  (Tr. at 3-8, 20-22, 36, 40-46, 65-66, 85-86,104-05).

AO 72A
(Rev.8/82)

probable cause exists . . . ."  United States v. Reeves, 604 Fed. Appx. 823, 827 (11th Cir. 2015); and see Lindsey, 482 F.3d at 1290-91 ("We also recognize that the police may 'draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'") (citation omitted).

After stopping behind Defendant's vehicle, the three officers exited the patrol vehicle, with Officer Munson approaching Defendant's vehicle on the driver's side and Officers Romer and Moore approaching on the passenger side.[19]  (Tr. at 11-12, 27-28, 50-51, 86).  As the officers reached the trunk area of Defendant's vehicle, Officer Moore advised that he observed Defendant leaning forward, using his right arm, as if reaching under the seat, which caused the officers to be concerned that Defendant may be placing something under or retrieving something, such as a firearm, from under the seat.[20]  (Tr. at 13, 29-30, 51, 70-71, 86-87, 94).  Officers Romer and Moore reached the

_____

[19]Due to the time of night and poor street lighting, the area was fairly dark except for the patrol vehicle's headlights, and Officers Munson and Moore recalled that they used their flashlights during the encounter.  (Tr. at 11, 49-50, 86, 94).

[20]Defendant challenges the credibility of Officer Moore's testimony regarding this observation because neither Officer Romer nor Officer Munson noticed any movements by Defendant at this time.  [Doc. 26 at 11] (Tr. at 30, 71).  Although the other officers did not observe suspicious movements by Defendant while approaching the vehicle, as explained *infra*, all three officers did make note of conduct by

passenger side window first, which Defendant partially rolled down, and Officer Romer instructed Defendant to roll down the driver's side window and converse with Officer Munson; instead, Defendant asked Officer Romer why they stopped him.[21] (Tr. at 12-13, 27-28, 30-31, 51-52, 87, 95-98).   Officer Romer also could not see Defendant's left hand. (Tr. at 13, 39).   Officer Moore testified that when he reached the passenger window, because he could not see Defendant's hands, he instructed Defendant to show his hands.  Defendant complied.  (Tr. at 95-98).   Defendant, however, ignored repeated instructions to roll down the driver's side window.  (Tr. at 12-14).  During this time, Officer Romer noticed the odor of raw marijuana, but he did not see any drugs or a firearm in the vehicle.  (Tr. at 12, 31-32).

---

Defendant as they were speaking with him, which, based on their experience, raised their concerns.  The court does not find the fact that only Officer Moore initially observed Defendant's suspicious movements material to the officers' credibility or their opinions drawn from their observations.

[21]On cross-examination, Officer Romer confirmed that he did not advise Defendant of the reason for the stop or ask for Defendant's drivers license or other documents.  (Tr. at 27-29, 35).  The record establishes that the officer was directing Defendant, instead, to roll down his driver's side window in order to converse with Officer Munson.  (Tr. at 12-13, 27-28).  Officer Romer explained that he followed his usual practice in conducting the stop because, if he had made the request for documents, to obtain them from Defendant would require him to reach into the vehicle.  (Tr. at 38).  Although not explicitly stated, doing so might endanger the officer.

20

And, when Officer Munson reached the driver's door, the window was rolled

down three to four inches, but Defendant refused to fully roll down the window despite

repeated instructions to do so.[22]  (Tr. at 12-14, 51-52, 87).  Officer Munson testified

that, based on his prior experience conducting traffic stops, Defendant's conduct,

including, shaking, heavy breathing, moving around a lot, not obeying commands,

looking back and forth between the officers and appearing to try to decide what to do

---

[22]Officer Munson testified that he did not have an opportunity to advise Defendant of the reason for the stop or to ask for documents due to Defendant's refusal to comply with commands and his actions.  (Tr. at 54, 67, 83).  And irregardless of whether the officers conducted a typical traffic stop, as the Government points out, the short duration of the stop (less than five minutes (Tr. at 16, 34-35, 58-61, 79; Gov't Ex. 1)) before probable cause was developed for Defendant's arrest and the search of the vehicle, simply does not support a finding that the length of the stop was unreasonable.  See Hernandez, 418 F.3d at 1212 n.7 ("Where at its inception a traffic stop is a valid one for a violation of the law, we doubt that a resultant seizure of no more than seventeen minutes can ever be unconstitutional on account of its duration: the detention is too short.  By the way, no appellate decision has been called to our attention [or for that matter to this court's attention] that has held such a short detention - linked to a legitimate traffic stop - to be an unreasonable seizure under the Fourth Amendment on account of the stop's duration."); and see United States v. Burrows, 564 Fed. Appx. 486, 490-91 (11th Cir. 2014) (noting that traffic stop only lasted twelve minutes before drug dog's alert); United States v. Trevino, 2015 WL 859386, at *8 (N.D. Ga. February 27, 2015) (noting that only eleven minutes elapsed between beginning of traffic stop and warning being issued); United States v. Hawkins, 2011 WL 2313672, at *4 (M.D. Ala. May 27, 2011) (finding that traffic stop of twenty-eight minutes not unreasonable given prior circuit court decisions allowing traffic stop of fifty minutes, citing United States v. Hardy, 855 F.2d 753, 761 (11th Cir. 1988), twenty minutes, citing United States v. Geboyan, 367 Fed. Appx. 99, 100 (11th Cir. 2010), and fourteen minutes, citing Purcell, 236 F.3d at 1278).

next, depicted "fight or flee."  (Tr. at 52-53, 75-76, 83).  The Officer observed

Defendant start to reach down to the driver's side floorboard and being concerned

Defendant was attempting to destroy evidence or grab "something to use on the

officers," the officer opened the driver's door and pulled Defendant out of the vehicle.

(Tr. at 12-14, 52-53, 62-63, 87).  During this time, Officer Moore walked around to the

driver's side to assist Officer Munson with securing and handcuffing Defendant.  (Tr.

at 14, 32-33, 53-54, 87, 99).  Although Defendant is correct that the mere fact of

furtive movements and suspicious conduct is not sufficient to establish probable cause,

the conduct observed by all three officers in this case is consistent with actions that

would cause a reasonable officer to be concerned for his safety and to take steps to

secure Defendant and, while not determinative, factors into the probable cause

equation.[23]  See, e.g., United States v. Reed, 402 Fed. Appx. 413, 416 (11th Cir. 2010)

(crediting officer's testimony that he observed the defendant's movements, that is,

"furtive 'fight or flight' eye movements" and hand and body positioning, which

indicated an attempt to conceal or discard something); United States v. Carter, 366

Fed. Appx. 136, 138 (11th Cir. 2010) (suspicious reaching provided articulable

---

[23]At a minimum, based on their observations, the officers would have been justified in conducting a pat down search of Defendant for their safety and that of the others, including Defendant.  See Smith, 481 Fed. Appx. at 543.

22

suspicion for detention based on officers' reasonable belief the defendant was engaging in illegal conduct and officer safety was at risk); United States v. Graham, 483 F.3d 431, 439 (6th Cir. 2007) (the officer's observation of the defendant "dip with his right shoulder toward the floor as if he was placing something under his seat" is "consistent with an attempt to conceal a firearm"); United States v. Edmonds, 240 F.3d 55, 61 (D.C. Cir. 2001) ("'furtive' gestures in response to the presence of the police can serve as the basis of an officer's reasonable suspicion").

As Defendant was removed from the vehicle, Officers Munson and Moore smelled the odor raw marijuana emanating from the open vehicle doorway. (Tr. at 75-76, 87). As noted, Officer Romer previously detected the odor of raw marijuana. (Tr. at 12, 31-32). Defendant challenges the credibility of the officers' testimony concerning their detection of the odor of marijuana because all three officers did not smell the marijuana at the same moment, because Officer Munson's testimony did not match Officer Romer's testimony about exposure to marijuana during academy training, and because no marijuana was found in the vehicle. [Doc. 26 at 12]. Officers Romer and Munson provided information regarding their training and experience to establish that they are familiar with the odor of raw marijuana. Officer Romer testified that as part of his training at the police academy, on one occasion at the crime lab, he

23

was introduced to the smell of raw marijuana, which has a distinctive odor, and that, during his time as an officer, he has had experience, fifty to one-hundred times, handling and smelling marijuana.  The officer said that he is familiar with the smell of raw marijuana.  (Tr. at 6-7, 18-20, 37-38).  Officer Munson testified, that, although he did not recall being exposed to marijuana during his police academy training, he has participated in more than one-hundred cases that involved both raw and burnt marijuana and that he is familiar with the smell of raw marijuana.  (Tr. at 44-45).  Merely because Officer Munson did not recall exposure to marijuana while training, with no evidence that the officers even attended the same academy training classes, does not undermine the familiarity both officers obtained while conducting traffic stops and seizing marijuana.  Likewise, the court does not find significant the fact that all three officers did not detect the odor of marijuana at the same moment - the important fact is that all three officers did detect the odor corroborating each other's testimony.

Finally, the fact that no evidence was introduced that raw marijuana was found in Defendant's vehicle does not refute the officers' testimony.  The court notes that the record did not disclose the extent of the search of Defendant's vehicle.  The only evidence introduced established that a firearm was seized from under the drivers' seat

24

(Tr. at 54-55) and that, after Defendant stated there was a Gucci bag in the center console, that item containing drugs - but not marijuana - was seized (Tr. at 55, 87). No evidence before the court establishes that a search of the vehicle was conducted that should have disclosed whether or not there was some, even small, amount of raw marijuana elsewhere in the vehicle. The evidence also does not foreclose consideration that raw marijuana might have recently been in the vehicle. In United States v. Dean, 2015 WL 3952715 (W.D. Tenn. June 29, 2015), the defendant challenged the credibility of the officer's statement that he detected the odor of raw marijuana because the subsequent vehicle search only produced "one gram of raw marijuana hidden inside the closed center console[.]"  Id., at *5. Although finding the officer's statement "improbable" - and noting that he was not corroborated by any other officers present, the court stated "that the smell could have come from marijuana that had been recently stored in the [vehicle]." Id. The court noted that other indications of drug distribution were found in the vehicle, including a firearm, which supported crediting the officer's testimony.  Id. In this case, as noted, the officers did locate a firearm and other narcotics which is indicative of drug trafficking and supports the officers' testimony. There is nothing "inherently unbelievable" regarding the testimony. See United States v. Johnson, 445 Fed. Appx. 311, 313 (11th Cir. 2011). And, besides Defendant's

25

contentions, "nothing in the record contradicts [the officers'] testimony" regarding detecting the odor of marijuana.  United States v. Zabalza, 346 F.3d 1255, 1259 (10th Cir. 2003).

The odor of raw marijuana, especially in light of Defendant's furtive actions and refusal to comply with commands, establishes probable cause.  See Johnson, 445 Fed. Appx. at 313 (detection of odor of marijuana gives rise to probable cause); United States v. Laughlin, 2012 WL 3065404, at *17 (N.D. Ga. July 6, 2012) (same).  There was probable cause to arrest Defendant at the time that he was removed from the vehicle.  And there was probable cause to support the warrantless search of the vehicle under the automobile exception to the warrant requirement.

Although as a general rule, the Fourth Amendment requires police officers to obtain a warrant before conducting a search, see California v. Carney, 105 S. Ct. 2066, 2069 (1985), in Carroll v. United States, 45 S. Ct. 280, 285 (1925), the Supreme Court established an exception to the warrant requirement for searches of automobiles and other moving vehicles.  Under the "automobile exception," "[i]f a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more."  Pennsylvania v. Labron, 116 S. Ct. 2485, 2487 (1996); see also United States v. Tamari, 454 F.3d 1259, 1261 (11th Cir.

2006) (indicating that "readily mobile" means "operational"). No separate exigent circumstances need to be shown. See Maryland v. Dyson, 119 S. Ct. 2013, 2014 (1999); United States v. Watts, 329 F.3d 1282, 1286 (11th Cir. 2003) ("[T]his Court made it clear that the requirement of exigent circumstances is satisfied by the ready mobility *inherent* in all automobiles that reasonably appear capable of functioning.") (quoting United States v. Nixon, 918 F.2d 895, 903 (11th Cir. 1990)) (internal quotation marks omitted; emphasis in original). There is no dispute that the vehicle was mobile having just been stopped by the trooper while operating on the roadway. (Tr. at 8-10, 47-49).

The validity of the search, accordingly, turns on whether there was probable cause to believe the vehicle contained contraband or evidence of a crime. Dyson, 119 S. Ct. at 2014; see also Lindsey, 482 F.3d at 1293 ("The key issue here is whether the police had probable cause for the search and seizure of the vehicle."). "Probable cause for a search exists when under the totality of the circumstances there is a fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Magluta, 418 F.3d 1166, 1182 (11th Cir. 2005) (citations and internal quotation marks omitted). As already determined, the detection of the odor of

27

marijuana emanating from the vehicle provided probable cause for the search.  See Johnson, 445 Fed. Appx. at 313; Laughlin, 2012 WL 3065404, at *17.

In addition to that evidence, when asked whether or not there was anything illegal in the vehicle, Defendant responded that there was a firearm and a Gucci bag which may have something inside (Tr. at 87-88); these statements provide additional support for the probable cause determination.  Although these statements were made while Defendant was in custody, as conceded by the Government [Doc. 28 at 9], and before Miranda warnings, if voluntary, the statements may be considered by the court in making the probable cause determination.  Defendant now contends, however, that the statements concerning the firearm and Gucci bag were not voluntary.  [Doc. 29 at 6-8].

As will be discussed *infra*, "Miranda 'warnings are required before any statement may be admitted into evidence at trial which was elicited from a person in custody through interrogation.'" United States v. Adams, 1 F.3d 1566, 1575 (11th Cir. 1993) (quoting Endress v. Dugger, 880 F.2d 1244, 1248 (11th Cir. 1989)).  In this case, after Defendant was removed from the vehicle by Officer Munson and as he was being handcuffed, Officer Moore asked Defendant if there was anything illegal in the vehicle.  Defendant responded that there was a firearm.  (Tr. at 54, 87).  And as Officer

28

Moore walked with Defendant, holding onto one of Defendant's arms, back to the patrol vehicle, the officer asked Defendant if there was anything else illegal in the vehicle.  Defendant responded that there "may be something inside of a Gucci bag" located in the center console.  (Tr. at 87).  The firearm and a Gucci bag, containing narcotics and methamphetamine, were seized from the vehicle.  (Tr. at 17, 54-55, 76, 78).  As framed by the Eleventh Circuit Court of Appeals in United States v. Jackson, 506 F.3d 1358 (11th Cir. 2007), under these circumstances, the question presented is "whether the Constitution requires the exclusion of physical evidence that was discovered on the basis of a defendant's voluntary statement elicited without the warnings required by Miranda . . . ."  Id. at 1359.  Relying on the Supreme Court decision in United States v. Patane, 124 S. Ct. 2620 (2004), the court concluded "at least, that Miranda does not require the exclusion of physical evidence that is discovered on the basis of a voluntary, although unwarned, statement."  Jackson, 506 F.3d at 1360-61; and see United States v. Manta-Carillo, 491 Fed. Appx. 125, 127 (11th Cir. 2012) ("the Self-Incrimination Clause in the Fifth Amendment does not bar the admission of physical evidence that is the fruit of an unwarned but voluntary statement").

29

Defendant contends that the two statements were not voluntary because he was forcibly removed from the vehicle, arrested without probable cause and handcuffed with three uniformed and armed police officers present. [Doc. 29 at 8]. The court has determined that the arrest was lawful. And the other factors identified by Defendant do not support a finding that his statements were involuntary. The Supreme Court has recognized "that . . . interrogation might possibly in some situations, by virtue of some special circumstances, be characterized as one where 'the behavior of . . . law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined. . . .'" Beckwith v. United States, 96 S. Ct. 1612, 1617 (1976) (citation omitted). Defendant contends that such "special circumstances" exist in the present case and that he was coerced into making the self-incriminating statements involuntarily. As a result, it is the court's duty "'to examine the entire record and make an independent determination of the ultimate issue of voluntariness.'" Id. (quoting Davis v. North Carolina, 86 S. Ct. 1761, 1764 (1966)). In determining whether a statement was made voluntarily, courts are to evaluate "the totality of all the surrounding circumstances--both the characteristics of the accused and the details of the interrogation." Schneckloth v. Bustamonte, 93 S. Ct. 2041, 2047 (1973). Those cases where courts have found confessions to be involuntary "have all

30

contained a substantial element of coercive police conduct." Colorado v. Connelly, 107 S. Ct. 515, 520 (1986). "[F]actors taken into account have included the youth of the accused, . . . his lack of education, . . . or his low intelligence, . . . the lack of any advice to the accused of his constitutional rights, . . . the length of detention, . . . the repeated and prolonged nature of the questioning, . . . and the use of physical punishment such as the deprivation of food or sleep. . . ." Schneckloth, 93 S. Ct. at 2047 (citations omitted); see also Hubbard v. Haley, 317 F.3d 1245, 1253 (11th Cir. 2003) ("Among the factors we must consider are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police"). "'Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession.'" United States v. Thompson, 422 F.3d 1285, 1295-96 (11th Cir. 2005) (citation omitted).

The facts in this case do not support a finding of police coercion rendering Defendant's statements involuntary. The interaction with the officers began as a simple traffic stop. (Tr. at 8-10, 47-50). Once the officers started speaking with Defendant, he was only removed from the vehicle, by Officer Munson opening the

31

driver's side door and grabbing his arm, after Defendant refused to obey commands to open his window and the officers observed furtive movements by Defendant indicative of him hiding or retrieving an item that might cause harm to the officers - including Officer Munson observing "fight or flee" eye movements. (Tr. at 12-14, 29-31, 39, 51-53, 62-63, 73-76, 83, 87, 96-98). The officers, as part of the traffic stop, had the right to ask Defendant to exit the vehicle, see Spoerke, 568 F.3d at 1248, and, under the circumstances, assisting Defendant in doing so by grabbing the arm believed to be reaching under the driver's seat was reasonable, as was handcuffing Defendant to prevent harm to the officers or Defendant from fleeing. Likewise, holding Defendant's arm as he was escorted to the patrol vehicle was not undue physical contact. (Tr. at 92, 99). The mere fact that Defendant was handcuffed and being detained, for a couple of minutes,[24] is insufficient to establish coercion. The officers' weapons remained holstered; Defendant was not threatened nor made any promises; and voices were only raised when Defendant failed to comply with commands while he was in the vehicle. (Tr. at 18, 91-93, 98). Officer Moore used a normal tone of voice when he questioned Defendant. (Tr. at 56-57). Unlike other cases where police

---

[24]As noted, the entire length of the stop and detention before the firearm and drugs were found was less than five minutes. (Tr. at 16, 34-35, 58-61, 79; Gov't Ex. 1).

32

conduct was found oppressive, here the officers had only briefly detained Defendant, handcuffing him because he was under arrest, asked only two questions and did not use or threaten to use physical punishment.  See Connelly, 107 S. Ct. at 520 n.1 (citing Mincey v. Arizona, 98 S. Ct. 2408 (1978) (defendant subjected to four hour interrogation while incapacitated and sedated in intensive-care unit); Greenwald v. Wisconsin, 88 S. Ct. 1152 (1968) (defendant, on medication, interrogated for over eighteen hours without food or sleep); Beecher v. Alabama, 88 S. Ct. 189 (1967) (police officers held gun to the head of wounded confessant to extract confession)). Defendant's statements were voluntary, and pursuant to Patane, may contribute to a finding of probable cause to search the vehicle.

The court finds that Defendant's arrest and the search of the vehicle were both supported by probable cause and **RECOMMENDS** that Defendant's motion [Doc. 16] to suppress evidence from the warrantless arrest and search be **DENIED**.

### c.    Post-Miranda Statements

Defendant initially contended that his post-Miranda statements were inadmissible as fruits of the pre-Miranda statements [Doc. 26 at 19]; however, apparently recognizing that the Supreme Court decision in Oregon v. Elstad, 105 S. Ct.

1285 (1985),[25] under the circumstances in this case, foreclosed that argument, Defendant now contends that these statements should be suppressed as fruits of the unlawful arrest and search of his vehicle [Doc. 29 at 9]. The court having found that the Defendant was lawfully arrested and that his vehicle was lawfully searched, his post-<u>Miranda</u> statement does not constitute fruit of an unlawful arrest or search and seizure. <u>United States v. Lopez-Garcia</u>, 565 F.3d 1306, 1315 (11th Cir. 2009) (the defendant's "fruit of the poisonous tree argument plainly collapses since . . . his Fourth Amendment rights were never violated"). And, although not argued by Defendant, he was advised of his <u>Miranda</u> rights and voluntarily, intelligently and knowingly waived those rights.

The first question that the court must answer is whether Defendant was advised of his <u>Miranda</u> rights. <u>See</u> <u>United States v. Barbour</u>, 70 F.3d 580, 585 (11th Cir. 1995) ("The threshold inquiry is whether [the defendant] was informed of his <u>Miranda</u>

---

[25]In <u>United States v. Street</u>, 472 F.3d 1298 (11th Cir. 2006), the Eleventh Circuit Court of Appeals explained that "<u>Elstad</u> sets out the general rule that the existence of a pre-warning statement does not require suppression of a post-warning statement that was knowingly and voluntarily made . . . ." <u>Id.</u> at 1312 (citing <u>Elstad</u>, 105 S. Ct. at 1293). An exception to this rule applies "for situations where the police employ a deliberate 'question first' strategy" which is not applicable to the case before this court. <u>Id.</u> (quoting <u>Missouri v. Seibert</u>, 124 S. Ct. 2601, 2613 (2004)). <u>And see</u> <u>United States v. Arroyo-Garcia</u>, 2014 WL 1309078, at **9-11 (N.D. Ga. March 31, 2014) (discussing and applying <u>Elstad</u> and <u>Seibert</u>).

rights."). In reaching this answer, the Supreme Court stated that it "has never indicated that the 'rigidity' of <u>Miranda</u> extends to the precise formulation of the warnings given a criminal defendant" and that "no talismanic incantation [is] required to satisfy its strictures." <u>California v. Prysock</u>, 101 S. Ct. 2806, 2809 (1981). The answer is to the first question is yes.

After Defendant was placed in a patrol vehicle for transportation, Officer Moore entered the vehicle and advised Defendant orally of his <u>Miranda</u> rights using a warning card. (Tr. at 16-17, 89-90; Gov't Exh. 2). The officer advised Defendant:

1. You have a right to remain silent.
2. Anything you say will be used in court as evidence against you.
3. You are entitled to have a lawyer now and have him present now or at anytime during questioning.
4. If you cannot afford a lawyer, one will be appointed for you without cost and he may be present at all times during your questioning.
5. You can decide at any time to exercise these rights and not answer any questions or make any statements.

(Gov't Exh. 2). Having found that Defendant was advised of his rights, the court must next determine whether Defendant voluntarily, knowingly and intelligently waived those rights.[26] <u>See Barbour</u>, 70 F.3d at 585.

---

[26]"It is well established that '[t]he government must prove by a preponderance of the evidence that [the defendant] made a knowing, voluntary and intelligent waiver of his <u>Miranda</u> rights.'" <u>United States v. Chirinos</u>, 112 F.3d 1089, 1102 (11th Cir.

> This is a two-part inquiry:
>
> "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the <u>Miranda</u> rights have been waived."

<u>Id.</u> (quoting <u>Moran v. Burbine</u>, 106 S. Ct. 1135, 1141 (1986) (internal citations and quotations omitted)); <u>see also</u> <u>United States v. Farley</u>, 607 F.3d 1294, 1326 (11th Cir. 2010) (same).  The totality of all the surrounding circumstances, which a court must evaluate to make these determinations, includes "both the characteristics of the accused and the details of the interrogation."  <u>Schneckloth</u>, 93 S. Ct. at 2047; <u>see also</u> <u>United States v. Bernal-Benitez</u>, 594 F.3d 1303, 1319 (11th Cir. 2010) (same).  No single factor is necessarily determinative of the issue whether a defendant voluntarily, knowingly and intelligently waived his rights, but the court must engage in a fact-specific inquiry based on all of the circumstances.  <u>See</u> <u>Moore v. Dugger</u>, 856 F.2d 129, 134 (11th Cir. 1988).

------

1997) (citation omitted).

The waiver of rights is on the reverse side of the <u>Miranda</u> card used by Officer Moore and reads as follows:

1. Do you understand these rights?
2. Do you wish to talk to us at this time without a lawyer?

(Tr. at 102; Gov't Exh. 2).  Defendant orally agreed to speak with the officer and made statements.  (Tr. at 90, 102).  During his waiver and <u>Miranda</u> statements, Defendant did not appear to be under the influence of drugs or alcohol, and no threats or promises were made by Officer Moore.  (Tr. at 91-93).  The officers only raised their voices when Defendant failed to comply with the instructions while he was seated in the vehicle; otherwise, the conversation was friendly and Defendant was calm.  (Tr. at 18, 56-57, 91).  The officers only touched Defendant to remove him from the vehicle, to handcuff him and to escort him to the area in front of the patrol vehicle.  (Tr. at 14, 53-54, 87, 92, 99).  Their weapons remained holstered during the traffic stop and questioning.  (Tr. at 91).  The totality of the circumstances establish that Defendant's waiver of his <u>Miranda</u> rights was knowing, intelligent and voluntary.

For these reasons, the court **RECOMMENDS** that Defendant's motions [Docs. 15 and 16] to suppress be **DENIED**.

37

### III.   Conclusion

Based on the foregoing cited authority and for the reasons stated, the court **RECOMMENDS** that Defendant's motions [Docs. 15 and 16] to suppress be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial.

**SO ORDERED AND RECOMMENDED** this 22nd day of March, 2016.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE

38